**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Logan Reid Murphy,** | |
| **Plaintiff,** | **Civil Action No.** |
| **v.** | |
| **LexisNexis Risk Solutions, Inc.,** | |
| **Defendant.** | |

**COMPLAINT AND JURY DEMAND**

This is an action for damages brought by an individual consumer against Defendant (named below) for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (the "FCRA").

**Introduction**

1. Plaintiff Logan Reid Murphy ("Mr. Murphy" or "Plaintiff") is a twenty-three-year-old college student with an Arizona driver's license, a clean driving record, and no connection to the State of Indiana. LexisNexis Risk Solutions, Inc. ("LexisNexis" or "Defendant") told his potential insurers otherwise.

2. LexisNexis merged Mr. Murphy's consumer file with that of Logan Joseph Murphy of Chesterton, Indiana — a different man who shares Mr. Murphy's first name, last name and date of birth, and nothing else. The two have different middle names, different Social Security numbers, and driver's licenses issued by different states.

3. Because of that, LexisNexis reported that Mr. Murphy had a suspended Indiana driver's license, six license suspensions, five traffic convictions — including a conviction for operating a vehicle while intoxicated — ten Indiana automobile insurance policies, six insurance

claims with approximately $79,000 in paid losses, and another individual's collection accounts and late payments. LexisNexis sold that file to State Farm and Progressive multiple times between April and July 2026.

4. The consequences were immediate. On his family's insurance agent's advice, Mr. Murphy was removed from his parents' State Farm policy so that the policy would not be cancelled. He was excluded as a driver from his wife's policy. He was quoted more than $2,400 for six months of liability-only coverage on a 2003 Ford Explorer. And the Arizona Motor Vehicle Division notified him that his registration would be suspended for lack of insurance and that he should not drive his vehicle.

5. Mr. Murphy did everything the FCRA asks of a consumer. He disputed the inaccurate information, item by item, over approximately nine hours of telephone calls. LexisNexis responded by telling him that records had been "removed" — and then generating a new copy of his file that still contained them. When he called to ask why, LexisNexis' representatives told him they could not find his file. Two weeks later, LexisNexis — which had already authenticated Mr. Murphy at least three different times — wrote that it was "unable to authenticate [his] identity" and would not process his request.

6. None of this should have happened. LexisNexis had Mr. Murphy's correct Social Security number, Arizona driver's license number and addresses. Every one of the other man's records carried an Indiana driver's license number, Indiana addresses, the middle name "Joseph," and a different Social Security number. A cursory comparison of identifiers would have kept the two files apart, and a reasonable reinvestigation would have separated them the moment Mr. Murphy disputed.

7. Plaintiff brings this action under Sections 1681e(b) and 1681i of the FCRA for LexisNexis' willful and negligent failure to follow reasonable procedures to assure the maximum possible accuracy of his consumer reports and its failure to conduct a reasonable reinvestigation and correct his file, and seeks actual, statutory and punitive damages, together with attorneys' fees and costs.

## Jurisdiction and Venue

8. Jurisdiction of this Court arises under 15 U.S.C. § 1681p, and 28 U.S.C. §1331, 1337.

9. Venue lies properly in this district pursuant to 28 U.S.C. §1391(b).

## Parties

10. Mr. Murphy is an adult individual who resides in Rexburg, ID, where he attends college. Mr. Murphy holds an Arizona driver's license, and his vehicle was registered in Arizona.

11. Defendant LexisNexis is a business entity that is registered to do business in the Commonwealth of Pennsylvania and regularly conducts business in the Eastern District of Pennsylvania, with a principal place of business located at 1000 Alderman Drive, Alpharetta, GA 30005. LexisNexis is known as a consumer reporting agency ("CRA") under the FCRA.

## Facts

### Consumer Reports and the Purpose of the FCRA

12. Consumer reports provide information bearing on, among other things, a consumer's creditworthiness, character, general reputation, personal characteristics and mode of living.

13. Consumer reports are meant to enable insurers, creditors and other providers of consumer services to make informed risk decisions about new applicants and existing customers. These reports are used to make decisions having to do with insurance, housing, employment, credit and more.

14. In order to obtain data to create consumer reports, CRAs utilize data technology which allows the near instantaneous flow of information to CRAs. This timely information is intended to lead to faster and better decision-making by its recipients.

15. What would appear to be a benefit of technology, however, has had the opposite effect on consumers, and has led to mishandling and misuse of information.

16. Early on Congress understood the dire consequences of inaccurate consumer reporting and enacted the FCRA to "insure that consumer reporting agencies exercise their grave responsibilities with fairness". See 15 U.S.C. § 1681(a).

17. In order to effectuate its goal of accurate consumer reporting, among other things, Congress mandated that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy" of the information it reports. See 15 U.S.C. § 1681e(b).

18. One of the primary purposes of the FCRA is to require CRAs to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

19. The preservation of one's good name and reputation is also a foundational principle of the FCRA:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

20. Thus, in order to further its objectives, embedded within the FCRA is the requirement that CRAs conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's file is corrected and/or deleted.

21. The FCRA further requires that, when a consumer disputes an item, the CRA "review and consider all relevant information submitted by the consumer," 15 U.S.C. § 1681i(a)(4), and that it "promptly delete" any item that is found to be inaccurate or that cannot be verified. 15 U.S.C. § 1681i(a)(5)(A).

22. Defendant failed to institute or adhere to policies and procedures that could have prevented the reporting of the mixed in information and failed to conduct a reasonable reinvestigation and correct Plaintiff's file once he disputed it.

**LexisNexis and the Insurance Reporting Industry**

23. LexisNexis regularly receives information from various sources around the country including insurance carriers, state motor vehicle departments, courts, other CRAs, lenders, debt collectors, public records vendors, and others.

24. The sources are known as "furnishers" within the consumer reporting industry and under the FCRA.

25. LexisNexis collects information from thousands of furnishers.

26. The process by which LexisNexis receives, sorts, and stores information is largely electronic.

27. LexisNexis maintains consumer files on hundreds of millions of consumers.

28. Among the consumer reports LexisNexis sells to automobile insurers are: (a) the Comprehensive Loss Underwriting Exchange, or "C.L.U.E.," report, which lists the automobile insurance claims LexisNexis associates with a consumer; (b) the "Current Carrier" report, which lists the current and prior automobile insurance policies LexisNexis associates with a consumer, including coverage, cancellations and lapses; and (c) driving records, including license status, suspensions and traffic convictions.

29. LexisNexis also furnishes automobile insurers with consumer credit information that it obtains from other CRAs, including Equifax Information Services, LLC ("Equifax"), Trans Union, LLC ("Trans Union") and Experian Information Solutions, Inc. ("Experian"), for use in insurance underwriting.

30. Automobile insurers rely on LexisNexis' reports to decide whether to issue or renew a policy, whether to include or exclude a driver, and how much to charge. Adverse information such as at-fault accidents, paid claims, license suspensions and convictions for driving

while intoxicated dramatically increases the premium an insurer will charge and frequently results in an insurer declining to write the risk at all.

31. Despite the law, CRAs, like Defendant, continue to inaccurately report consumer information resulting in significant harm to consumers, which can include denial of insurance, housing, employment, and credit.

32. LexisNexis places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to providing them to Defendant's customers.

33. LexisNexis reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate information.

34. Thus, to further its own economic ends, the Defendant does not employ reasonable procedures to assure the maximum possible accuracy of information it reports regarding consumers and fails to ensure that the information it reports relates to the appropriate consumer to which it should be associated.

35. As the Brookings Institution explained, "[w]ith money on the line, you might assume that the credit reporting system would fix the problem. In reality it is the opposite. Speed and volume are favored over accuracy. Large-scale inaccuracies are tolerated. The costs of correcting the data outweigh benefits — for the credit bureaus, though, not the consumers…Given the importance of credit scores, why are they so inaccurate? Three reasons: size, speed, and economic incentives of the system."

**Mixed File Problems of the Consumer Reporting Industry**

36. Defendant is well aware that different consumers can have similar names.

37. Defendant also knows that different consumers can have similar Social Security numbers, birthdays and other personal identifying information.

38. Defendant matches insurance policy, claim, driving, public record and credit information to a consumer file by comparing the information about the consumer associated with the record to the information it maintains about the consumer in the consumer file.

39. Sometimes Defendant's matching algorithms associate information belonging to one consumer to the consumer file of another consumer; resulting in what is commonly known in the industry as a mixed or merged file.

40. A mixed or merged file is the result of Defendant inaccurately mixing personal identifying information, public record information, insurance information, credit information and/or an entire consumer file belonging to one consumer into the file of another consumer. See F.T.C. v. TRW, Inc., 784 F. Supp. 361, 362 (N.D. Tex. 1991) (The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report.")

41. Mixed files are not a new phenomenon.

42. LexisNexis has a long-standing and specific knowledge of the mixed file problem.

43. There are many different possible causes for a mixed file but all of them relate in one way or another to the algorithms (the database rules) used by the Defendant to match personal identifying information and insurance, driving, public record and credit information to a particular consumer's file.

44. These rules also determine which files are selected by the algorithm and are merged to create a complete consumer report.

45. Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumers' information belonging to different consumers into one consumer report.

46. LexisNexis has admitted, in its own correspondence to Mr. Murphy, that its "matching process accounts for potential variations in name, address, and other minor identifiers found in our files." In other words, LexisNexis has designed its matching procedures to tolerate mismatches in the very identifiers that distinguish one consumer from another.

**The Consumer Reporting Industry's Long History of Mixed Files**

47. LexisNexis has been on notice for decades of the existence of mixed files and the fact that procedures for creating consumer files, including matching algorithms, are prone to frequently caused errors. See Thompson v. San Antonio Retail Merchants Ass'n, 682 F.2d 509, 511 (5th Cir. 1982).

48. "Mixed files" create a false description and representation of a consumer's history.

49. Moreover, mixed files result in the disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge, consent, or both.

50. LexisNexis has been sued many times wherein an allegation was made that it violated the FCRA, including by mixing a consumer's file with that of another person.

51. Private FCRA lawsuits have resulted in significant settlements and verdicts for consumers who fall victim to a mixed file.

52. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." Dalton v. CAI, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated

noncompliance with statutory duties can establish that the defendants acted willfully. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

53. No less than three federal Courts of Appeal have held that a CRA violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another individual.

54. Finally, the FTC has specifically warned CRAs to review their procedures when a mixed file case occurs.

55. Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed consumer files remain a significant problem for Defendant, as well as innocent consumers, including Plaintiff.

**Case Background**

**Two Different Consumers**

56. Mr. Murphy is twenty-three years old. He grew up in Peoria, Arizona, where his parents still live and where he was a listed driver on his parents' State Farm automobile policies. He holds an Arizona driver's license. He attends college in Rexburg, Idaho, where he lives with his wife, whom he married in April 2026. He is also employed.

57. Mr. Murphy has never lived in Indiana, has never held an Indiana driver's license, has never been a party to an Indiana automobile insurance policy or claim, has never had his driver's license suspended, and has never been arrested for, charged with, or convicted of driving while intoxicated.

58. Logan Joseph Murphy (the "Other Consumer") is a different person who lives in Chesterton, Indiana. He holds an Indiana driver's license, which is suspended. He has a different

middle name and a different Social Security number than Mr. Murphy. His automobile insurance policies are Indiana policies co-insured with a woman named Joyce L. Murphy, whom Mr. Murphy does not know.

59. Mr. Murphy and the Other Consumer share a first name, a last name, and a date of birth. They share nothing else as far as Mr. Murphy is aware.

**LexisNexis Merged the Two Consumers' Files**

60. At all relevant times, LexisNexis' consumer file for Mr. Murphy contained, and LexisNexis reported as Mr. Murphy's, the following information belonging to the Other Consumer (collectively, the "Inaccurate Information"):

a. the name variations "Logan J Murphy" and "Logan Joseph Murphy";

b. addresses in Chesterton, Portage and Michigan City, Indiana;

c. the Indiana Bureau of Motor Vehicles as a "source" of Mr. Murphy's identifying information, even though Mr. Murphy has never had any dealings with the Indiana Bureau of Motor Vehicles;

d. an Indiana driver's license record for "Logan Joseph Murphy," including his physical description and Indiana address, with a license status of "SUSPENDED";

e. six driver's license suspensions between April 2025 and June 2026, for chemical test failure, operating a vehicle per se, failure to appear for a driver safety program, failure to file proof of insurance, failure to file an SR-22, and pending chemical test results;

f. traffic convictions from Indiana courts, including speeding, following too closely, failure to provide proof of insurance, and a March 24, 2025,

conviction in Porter Superior Court for operating a vehicle per se with a blood alcohol concentration of .08 or more, together with fourteen "current points," a specialized driving privilege, and an SR-22 filing;

g. ten Indiana automobile insurance policies issued by State Farm and Progressive to "Logan J Murphy," co-insured with Joyce L. Murphy, covering Indiana vehicles, several of which reflect mid-term cancellations;

h. six automobile insurance claims, with loss dates of January 3, 2023, June 1, 2024, January 24, 2025, August 29, 2025, June 17, 2026, and July 17, 2026, with approximately $79,000 in paid collision, property damage and medical payments;

i. credit report information obtained from Equifax and Experian for "Logan J Murphy" of Chesterton and Portage, Indiana, including, on the Experian report, two Capital One collection accounts, two LVNV Funding accounts reported as bad debts, late payments, and the Other Consumer's employer; and

j. approximately sixty inquiries by a debt collector, Midland Credit Management, and numerous automobile-finance credit inquiries, all of which relate to the Other Consumer's debts and credit applications.

61. None of the Inaccurate Information belongs to Mr. Murphy.

62. Every item of the Inaccurate Information carried identifiers that plainly did not match Mr. Murphy: an Indiana driver's license number, Indiana addresses, the middle name "Joseph," a different Social Security number, and a co-insured whom Mr. Murphy has never met.

63. LexisNexis had Mr. Murphy's correct Social Security number, Arizona driver's license number, and Arizona and Idaho addresses in its file. It reported the Inaccurate Information anyway.

**The Mixed File Costs Mr. Murphy His Insurance**

64. Mr. Murphy married in April 2026 and, in June 2026, began shopping for his own automobile insurance.

65. Every insurer from which Mr. Murphy sought a quote told him that his record reflected multiple accidents, violations and insurance claims, which he knew were not his.

66. Mr. Murphy contacted his parents' State Farm agent to find out why. The agent informed Mr. Murphy that his information was being blended with that of the Other Consumer and sent Mr. Murphy a news article — including a booking photograph — reporting the Other Consumer's June 17, 2026, arrest for driving under the influence.

67. The agent advised Mr. Murphy's parents to remove Mr. Murphy from their Arizona State Farm policy before the Inaccurate Information caused the policy to be cancelled. Mr. Murphy's parents did so, and Mr. Murphy's coverage under his parents' policy ended on or about July 21, 2026.

68. When Mr. Murphy's wife obtained a Progressive policy in Idaho on or about July 8, 2026, Mr. Murphy was listed on the policy as an "Excluded Driver."

69. Mr. Murphy learned that the Inaccurate Information was coming from LexisNexis.

**Mr. Murphy's Disputes**

70. On June 30, 2026, Mr. Murphy called LexisNexis to dispute the Inaccurate Information and to request a copy of his file. LexisNexis' representative initially could not verify

Mr. Murphy's identity — because the identifying information in his LexisNexis file had been blended with the Other Consumer's.

71. Mr. Murphy provided LexisNexis with identity documents, and was then permitted to dispute, by telephone, the accidents and violations that had appeared on his insurance quotes. He also requested a copy of his file.

72. That same day, LexisNexis mailed Mr. Murphy two letters: one stating that it was unable to authenticate his identity, and one describing its dispute procedures.

73. On July 3, 2026, LexisNexis confirmed by email that it had received Mr. Murphy's email (the email included his identity documents), and by letter dated July 3, 2026, LexisNexis provided Mr. Murphy with access to his file disclosure.

74. Upon reviewing his file, Mr. Murphy confirmed that LexisNexis had merged his file with the Other Consumer's. His file was littered with the Other Consumer's addresses, court records, insurance claims and policies, traffic violations, and accidents.

75. On July 14, 2026, Mr. Murphy called LexisNexis to dispute the remaining Inaccurate Information. He had to call approximately five times because, on more than one occasion, the call was disconnected before he was able to resolve his inquiry. After a total of approximately 102 minutes on the telephone, Mr. Murphy disputed each remaining item and was told that LexisNexis would respond within thirty days.

76. Mr. Murphy's disputes explained that he was not Logan Joseph Murphy, that he had a different middle name, Social Security number, driver's license and state of residence, and that the Inaccurate Information did not belong to him.

77. By letter dated August 2, 2026, LexisNexis reported the results of its reinvestigation of Mr. Murphy's disputes. LexisNexis stated that court records from Tippecanoe, Portage, Gary,

Valparaiso and Michigan City, Indiana had been "removed," but that an automobile insurance claim record furnished by State Farm of Bloomington, Illinois — the Other Consumer's insurer — was "accurate and will remain on your file."

78. The link LexisNexis provided in the August 2, 2026 letter to view his updated file did not work.

79. By letter dated August 12, 2026, LexisNexis reported the results of its reinvestigation of Mr. Murphy's disputes. LexisNexis stated that certain records had been removed; that certain insurance policy records were "unverifiable"; and that other insurance policy records furnished by State Farm and by Progressive were "accurate and will remain on your file." The letter enclosed a link to "a current copy of your file," which LexisNexis stated, "has been generated to include the most up to date data."

80. Mr. Murphy accessed the "current copy" of his file, a 204-page consumer disclosure dated August 12, 2026. The Inaccurate Information was still there. The disclosure still contained the Other Consumer's Indiana driver's license record, his six suspensions, his traffic convictions — including the March 24, 2025, conviction for operating a vehicle with a blood alcohol concentration of .08 or more, which LexisNexis had told Mr. Murphy ten days earlier had been "removed" — his ten Indiana insurance policies, his six insurance claims, his Indiana addresses, and the Experian and Equifax credit information LexisNexis had furnished as Mr. Murphy's.

81. The court records LexisNexis had reported as "removed" on August 2, 2026, remained in Mr. Murphy's file on August 12, 2026, now attributed to a different source — the Indiana Bureau of Motor Vehicles — rather than to the courts LexisNexis claimed to have contacted in his prior report.

82. LexisNexis "verified" the Other Consumer's State Farm and Progressive records as Mr. Murphy's even though those records bore an Indiana driver's license number, Indiana addresses and a co-insured that did not match the identifying information LexisNexis had for Mr. Murphy, and even though Mr. Murphy had told LexisNexis exactly whose records they were.

83. On August 19, 2026, Mr. Murphy immediately called LexisNexis. While Mr. Murphy was looking at the file he had accessed using the link and PIN LexisNexis had mailed him, LexisNexis' representatives told him that they could not find his file. After approximately 104 minutes on the telephone, and after the call was disconnected, Mr. Murphy then called back and was told that a supervisor would call him back the following day.

84. A LexisNexis supervisor called Mr. Murphy on August 20, 2026. She could not tell him what was going on, and told him that she would manually write down, again, each of the records Mr. Murphy had disputed that remained in his file despite LexisNexis' statement that they had been removed.

85. On August 25, 2026, a LexisNexis representative told Mr. Murphy that his file was "in the backend being recreated." The representative could not tell Mr. Murphy when the problem would be resolved.

86. By letter dated August 26, 2026, LexisNexis — once again — informed Mr. Murphy that it was "unable to authenticate your identity and could not process your request." This was despite previously having accepted his identity documents to process a prior dispute.

87. Mr. Murphy called LexisNexis again on August 31 and September 1, 2026. On September 1, 2026, a LexisNexis supervisor told Mr. Murphy that there was no one at LexisNexis to whom he could speak to ensure that his file was corrected.

88. On September 1, 2026, Mr. Murphy filed a complaint with the Consumer Financial Protection Bureau.

89. On September 11, 2026, in response to Mr. Murphy's CFPB complaint, LexisNexis' "Escalations" unit emailed Mr. Murphy that it was, again, "unable to authenticate your identity and therefore cannot process your request."

90. In total, Mr. Murphy spent approximately nine hours on the telephone with LexisNexis attempting to have the Inaccurate Information removed from his file.

91. As of the date of this Complaint, LexisNexis has not provided Mr. Murphy with a corrected file disclosure and has not confirmed to him that the Inaccurate Information has been removed.

**<u>The Consequences</u>**

92. On or about August 17, 2026, the Arizona Department of Transportation, Motor Vehicle Division, mailed Mr. Murphy an "Insurance Suspension" notice for his 2003 Ford Explorer, stating that no insurer had reported an Arizona insurance policy for the vehicle, that his registration would be suspended if a policy was not reported by September 1, 2026, that a reinstatement fee would be required, and that he should not drive the vehicle until he obtained Arizona liability insurance.

93. On September 8, 2026, Progressive quoted Mr. Murphy $2,432 for six months of liability-only coverage — with no collision or comprehensive coverage — on his 2003 Ford Explorer. Progressive's quote attributed to Mr. Murphy six accidents, with loss dates identical to the six claims of the Other Consumer that LexisNexis had reported as Mr. Murphy's.

94. Mr. Murphy is a college student and an employee who must drive to attend school and to work. Because of the Inaccurate Information, he lost the coverage he had under his parents'

policy, was excluded from his wife's policy, could not obtain replacement coverage at a fair price, and was told by the State of Arizona not to drive his vehicle.

95. Mr. Murphy has also been forced to live with the knowledge that insurers, and anyone else who purchases a LexisNexis report about him, will see him described as a driver with a suspended license, fourteen points, an SR-22 filing, a conviction for driving while intoxicated, six accidents, and unpaid collection accounts — none of which is true.

**LexisNexis Failed to Follow Reasonable Procedures and Failed to Conduct a Reasonable Reinvestigation**

96. Defendant failed to institute or adhere to policies and procedures that could have prevented the reporting of the Inaccurate Information. The consumer to whom the Inaccurate Information belongs certainly has a different Social Security number, middle name, driver's license number and issuing state, addresses and other relevant identifying information. If such information was not available to Defendant to confirm the accuracy of the Inaccurate Information, the Inaccurate Information should not have been reported.

97. Mr. Murphy's disputes triggered LexisNexis' obligation under Section 1681i(a) of the FCRA to conduct a reasonable reinvestigation, to review and consider all relevant information he submitted, and to promptly delete any information that was inaccurate or could not be verified.

98. A reasonable reinvestigation would have compared the identifying information on each disputed record — Indiana driver's license, Indiana addresses, the middle name "Joseph," a different Social Security number, a co-insured named Joyce L. Murphy — to the identifying information LexisNexis had for Mr. Murphy and would have determined in minutes that the records did not belong to him.

99. Instead, upon information and belief, LexisNexis' reinvestigation consisted of asking the furnishers of the disputed records whether the records existed, rather than whether they

pertained to Mr. Murphy, and accepting whatever the furnishers reported back. This is not a reasonable reinvestigation. It is a perfunctory data match that does nothing to evaluate the merits of a consumer's dispute.

100. Even where LexisNexis claimed to have "removed" disputed records, it failed to actually delete the Inaccurate Information from Mr. Murphy's file, and the same records continued to appear in the very file disclosure LexisNexis generated to report the results of its reinvestigation.

101. LexisNexis compounded its failures by refusing to authenticate Mr. Murphy — a consumer it had already authenticated repeatedly — and by telling him that his file could not be located, thereby preventing Mr. Murphy from further disputing the Inaccurate Information or obtaining a corrected disclosure. The failure to process Mr. Murphy's disputes, as required under the FCRA, was a further violation of Section 1681i(a).

102. The policies and procedures of LexisNexis could not have been reasonable because, among other reasons, a cursory review of the personal identifying information of the individual whose records were listed within Plaintiff's file — his middle name, Social Security number, driver's license number and issuing state, and addresses — did not match that of Plaintiff.

103. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking insurance by prejudicing prospective insurers with inaccurate information.

104. Defendant knew or should have known that its actions violated the FCRA. Additionally, the Defendant could have taken the steps necessary to bring its agents' actions within compliance with the statutes but neglected to do so and failed to adequately review those actions to ensure compliance with said laws.

105. Plaintiff's consumer reports and file have been obtained from the Defendant and have been reviewed by prospective and existing insurers, and the Inaccurate Information has been a substantial factor in precluding Plaintiff from receiving insurance coverage and insurance opportunities at fair rates, known and unknown.

106. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of insurance coverage and insurance opportunities; increased cost of insurance; loss of time and money; interference with his ability to drive to school and to work and with his daily activities; reputational damage; loss of sleep; and emotional distress, including mental anguish, anxiety, fear, worry, stress, anger, frustration, humiliation, and embarrassment, including that attendant to his disputes and to being repeatedly disbelieved, disconnected, and told that he could not be identified by the company that was selling reports about him.

**Count One – Violations of the FCRA**

**Plaintiff v. LexisNexis**

107. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

108. At all times pertinent hereto, LexisNexis was a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

109. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

110. At all times pertinent hereto, the above-mentioned consumer reports, including the C.L.U.E., Current Carrier, driving record and credit reports LexisNexis furnished to State Farm and Progressive, were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

111. LexisNexis has violated numerous provisions of the FCRA for its improper actions, including but not limited to Sections 1681e(b) and 1681i of the FCRA. LexisNexis willfully and negligently violated the FCRA and is liable for damages to Plaintiff pursuant to Section 1681n and 1681o of the FCRA.

112. The conduct of LexisNexis was a direct and proximate cause, as well as a substantial factor, in bringing about the actual damages and harm to Plaintiff that are outlined more fully above and, as a result, Defendant is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorneys' fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## JURY TRIAL DEMAND

113. Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendant, based on the following requested relief:

a. Actual damages;

b. Statutory damages;

c. Punitive damages;

d. Costs and reasonable attorneys' fees; and

e. Such other relief as may be necessary, just and proper.

**THE KIM LAW FIRM, LLC**

BY: /s/ Richard H. Kim
Richard Kim, Esquire
1515 Market St., Suite 1200
Philadelphia, PA 19102
Ph. 855-996-6342/Fax 855-235-5855
rkim@thekimlawfirmllc.com

*Attorney for Plaintiff Logan Reid Murphy*

Date: October 13, 2026